CURB RECORDS, INC.,          )
                            )
          Plaintiff,         )
                            )
v.                           )          Civil Action No. _____
                            )
SAMUEL T. McGRAW, p/k/a/ TIM McGRAW,  )
McGRAW MUSIC, LLC and        )
BIG MACHINE RECORDS, LLC,     )
                            )
          Defendants.        )

## COMPLAINT

### I. The Parties, Jurisdiction and Venue

1.     Curb Records, Inc. ("Curb Records") is a corporation organized and existing under the laws of the state of Tennessee with its principal office located in Nashville, Davidson County, Tennessee.  It is engaged in, among other things, the business of creating and funding records and other media embodying the performances of recording artists and marketing them nationally and internationally.

2.     The Defendant Samuel T. McGraw p/k/a Tim McGraw ("Tim McGraw" or "McGraw") is a citizen and resident of the state of Tennessee.  He resides in this judicial district. He is a recording artist and entertainer.

3.     Defendant McGraw Music, LLC ("McGraw Music") is a Tennessee Limited Liability Company having its principal office in Nashville, Davidson County, Tennessee.

4.     Defendant Big Machine Records, LLC ("Big Machine Records") is a Delaware Limited Liability Company having its principal office in Davidson County, Tennessee.

5.     This Court has personal jurisdiction over the Defendants as they reside in the state of Tennessee.  This Court has exclusive subject matter jurisdiction over the copyright claims in this cause pursuant to 28 U.S.C § 1338(a), as they arise under the Copyright Laws of the United States, 17 U.S.C. §§ 101, et seq.  Moreover, pursuant to 28 U.S.C. § 1367, this Court has subject matter jurisdiction over the additional claims herein because they arise not only from the same set of operative facts, but they are so inextricably interwoven that the claims interrelate and these same facts give rise to all of the claims herein, forming one case or controversy.  Venue is proper in this Court pursuant to 28 U.S.C. § 1400, as the Defendants reside in this judicial district.

## II.  The Facts

6.     On or about March 12, 1997, Curb Records and McGraw entered into an exclusive recording agreement which was amended in 2001, at which time Curb Records reduced the number of Option Period Albums, as defined herein, which McGraw had agreed to provide, subject to McGraw's Delivering the other Option Period Albums as he had otherwise agreed (the "Recording Agreement").[1]  Curb Records asserts that the term of the Recording Agreement has yet to expire.

7.     Among other things, the Recording Agreement provides that, with reference to the rights transferred by McGraw to Curb Records,

> You hereby grant and convey to Curb and confirm that Curb shall be the exclusive perpetual owner of all Masters (and all other recordings [if any] embodying your performances during the term hereof) throughout the universe, including without limitation, all copyrights therein as a 'work made for hire.'  Curb and all parties authorized by Curb shall have the exclusive right to exploit

---

[1] Quotes from and references to definitions and specific sections of the Recording Agreement in the Complaint refer to the original, unamended, March 12, 1997 recording agreement between Curb Records and McGraw.  The limited changes in the 2001 amendment are explained in detail in paragraph 36 of the Complaint.

> the Masters (and all such other recordings), and to use your
> name, voice and likeness with respect to such exploitation.

8. Pursuant to the Recording Agreement, McGraw initially granted Curb six (6) options to extend the term of the Recording Agreement for one (1) option period which continued until nine (9) months after "Delivery to Curb of all Masters required during such option period."

9. The Recording Agreement further provides that "Delivery" means "delivery to and acceptance by Curb of all multitrack tapes of your recordings, along with a finished digitally mixed and mastered two-track master of each Master together with all consents, approvals, label copy information, songwriter and publisher information, credits, photographs, artwork and other material (including without limitation producer agreements) which may be at any time required by Curb for the release of commercial phonograph records embodying any such recordings and the manufacture of record covers or any other packaging desired therefor." In addition, the Recording Agreement further provides in section 14.k therein that "For the avoidance of doubt, 'Delivery to Curb'... includes all elements as set forth in the definition of 'Delivery to Curb' in paragraph 9 of this agreement (not just delivery of the applicable Masters)."

10. On or about May 21, 2012, Defendant Big Machine Records announced that it had entered into a recording agreement with Defendant McGraw. Defendant McGraw has stated that he has recorded at least twenty (20) recordings for his "debut" for Big Machine Records and, in addition, a Christmas record which he has exploited outside of the Recording Agreement. Each of these recordings was recorded during the term of the Recording Agreement, and is, therefore, a "Master" owned by Curb Records.

11. On or about December 13, 2012, Tim McGraw disclosed that on February 5, 2013 "via Big Machine Records" he would release a studio album entitled "Two Lanes Of Freedom."

3

He further stated that the album would be comprised of eleven (11) tracks and that, in addition, a Deluxe Edition thereof would embody four (4) additional tracks, including a live recording of the musical composition entitled "Truck Yeah." These recordings are identified as follows:

| | |
|---|---|
| "Two Lanes Of Freedom" | "Truck Yeah" Live |
| "One Of Those Nights" | "Number 37405" |
| "Friend Of A Friend" | "It's Your World" |
| "Southern Girl" | "Highway Don't Care" |
| "Truck Yeah" | "Annie I Owe You A Dance" |
| "Nashville Without You" | "Tinted Windows" |
| "Book Of John" | "Let Me Love It Out Of You" |
| "Mexicoma" | |

Eleven (11) of the recordings embodied on "Two Lanes Of Freedom" were recorded in November 2011. The remaining studio recordings were recorded on or about April 24, 2012. They were released to the public by Big Machine Records on or about February 5, 2013. All of the foregoing recordings are referred to herein as "the Undelivered Masters."

12. Defendant McGraw Music claims copyright ownership in the Undelivered Masters. As of the date of this Complaint, the United States Copyright Office does not reflect any registration of those copyrights or applications therefor by Defendants.

13. McGraw recorded the Undelivered Masters before the expiration of the term of the Recording Agreement because the fifth Option Period Album has yet to be Delivered to Curb Records[2]. Even if the album *Emotional Traffic*, which McGraw asserts is the fifth Option Period Album, is found to constitute the fifth Option Period Album, it has not been Delivered to Curb Records and therefore, the Undelivered Masters were recorded during the term of the Recording

---

[2] Signed producer agreements for the album *Emotional Traffic*, a required element to be provided to and approved by Curb Records before Delivery is accomplished, have still not been provided to Curb Records, and clearances from Faith Hill and her record label, Warner Bros., allowing Curb Records to exploit the performance of Faith Hill which is embodied thereon were not provided until December 2011.

Agreement. Curb Records, therefore, owns, exclusively, the Undelivered Masters, and the copyrights therein.

14. The Defendants have infringed and are continuing to infringe Plaintiff's copyrights in the Undelivered Masters. Not only have the Defendants infringed Plaintiff's copyrights in the Undelivered Masters, but McGraw has materially breached the Recording Agreement in additional material ways. In 2009, with the obligation still remaining under the Recording Agreement to, inter alia, provide two more Option Period Albums which had to meet certain contractual parameters to meet his Delivery obligation thereunder, and after the parties had operated for years pursuant to the Recording Agreement, Tim McGraw, having recently hired Coran Capshaw, as his personal manager who failed to read the Recording Agreement or to otherwise familiarize himself with McGraw's obligations thereunder, determined that he would no longer honor it and repudiated his remaining obligations. Specifically,

- McGraw ignored his obligation to record the fifth Option Period Album during the fifth Option Period; and

- McGraw ignored his obligation to record the fifth Option Period Album between 12 and 18 months after Delivery of the fourth Option Period Album; and

- McGraw ignored his obligation to allow Curb Records to approve the content of his purported fifth Option Period Album; and

- McGraw recorded two albums at once (claiming each to be an Option Period Album), during the fourth Option Period, contrary to the provisions of the Recording Agreement; and

- McGraw ignored his obligation to Deliver the fifth Option Period Album between 18 and 24 months from Delivery of the fourth Option Period Album; and

5

- McGraw ignored his obligation to provide all recordings to Curb Records, instead hiding recordings recorded during the term of the Recording Agreement, some of which Curb Records has paid for, and erasing certain of those recordings that belonged exclusively to Curb Records; and

- McGraw ignored his obligation to Deliver to Curb Records all recordings made during the term of the Recording Agreement, instead, providing certain of those recordings to Big Machine Records as the Undelivered Masters and/or exploiting them in concert with others and/or directly; and

- Coran Capshaw stated that, having never taken the time to review the Recording Agreement, he "didn't know anything about" Curb Records' approval rights and claimed to be unaware of any parameters to which McGraw had agreed in the Recording Agreement mandating the timing of recording the fifth Option Period Album; and

- McGraw ignored, until on or about December, 2011, his obligation to provide clearance documents evidencing Warner Bros.' consent to Curb Records' use of its artist Faith Hill's vocal performance embodied on an *Emotional Traffic* Master, as well as Faith Hill's consent in connection therewith, without which Curb Records is unable to release *Emotional Traffic*; and

- McGraw ignored his obligation to provide producer agreements to Curb Records with respect to "Emotional Traffic", as the co-producer agreement for Darran Smith and the co-producer agreement for Byron Gallimore, producers of the *Emotional Traffic* Masters, remain unsigned, although long ago provided to them by Curb Records; and

- McGraw has ignored his obligation to Deliver a fifth Option Period Album at all to Curb Records; and

- McGraw has ignored his obligation not to record for any entity other than Curb Records during the term of the Recording Agreement.

15. Although the Recording Agreement sets forth in detail the terms and conditions which govern the relationship between Curb Records and Tim McGraw, the arrangement therein regarding the recording services which Tim McGraw is obligated to provide to Curb Records is basic. The Recording Agreement provides that during its term, Tim McGraw shall render his services as a recording artist exclusively for Curb Records. The parties agreed that any recordings made by Tim McGraw during the term of the Recording Agreement would belong exclusively to Curb Records which also has the exclusive right to exploit those recordings. There was an initial period which required McGraw to record and Deliver three (3) albums. Thereafter Curb Records was granted additional option periods. Regardless of any other recordings which he chose to record during the term of the Recording Agreement, during each of the six (6) option periods,[3] Tim McGraw agreed that he would record and Deliver at least one (1) studio album of Masters which was required to meet certain conditions as set forth in the Recording Agreement. The albums which met these contractual criteria, only, would fulfill his recording commitment. They are referred to herein as Option Period Albums and must meet the criteria, among others, set forth in section 1.e. of the Recording Agreement. Otherwise, Tim McGraw was free to record for Curb Records whenever he chose. If he chose to record additional recordings during the term of the Recording Agreement, he agreed therein to Deliver

---

[3] Option Periods in the Recording Agreement were reduced from six (6) to five (5) as explained in paragraph 36 of the Complaint.

any and all such recordings to Curb Records, exclusively, and any and all such additional recordings would be owned by Curb Records exclusively.

16.    The term of the Recording Agreement continues until the expiration of nine (9) months "after your [McGraw's] Delivery to Curb of all Masters required during such option period." Moreover, Delivery of such Option Period Albums triggered significant financial obligations of Curb Records to Tim McGraw. As set forth in section 14.f. of the Recording Agreement, for example, Advances with respect to such Option Period Albums (and only those albums) could range from $500,000 to $1,500,000, subject to the application of the formulae described therein.

17.    Tim McGraw agreed that each Option Period Album would contain musical selections which he and Curb Records would mutually approve.

18.    To insure that the Masters would be topical and new he agreed that all Masters embodied upon each Option Period Album would be recorded "no earlier than twelve (12) months nor later than eighteen (18) months following Delivery to Curb of the immediately preceding album in fulfillment of" his recording commitment.

19.    Further, the importance of the time when such Option Period Albums are recorded is reflected in the Recording Agreement because the parties expressly conditioned Curb Records' obligation to pay the above-described Advances for Option Period Albums pursuant to section 14.f. of the Recording Agreement upon such Option Period Album being recorded, among other conditions, in conformity with the appropriate recording time provisions of the Recording Agreement.

20.    McGraw further agreed to Deliver each Option Period Album to Curb Records during the twelve (12) to eighteen (18) month period following Delivery of the immediately

8

preceding album in fulfillment of his recording commitment. The parties further agreed that this period could be extended for six (6) additional months if Curb Records elected, during any such option period(s), to release a Greatest Hits album. As previously set forth at paragraph 9 herein, the parties also agreed upon the elements that were required to be provided to Curb Records in order to constitute "Delivery."

21.    These provisions of the Recording Agreement recognize the significant interests of both parties designed to maximize sales of each album. The musical selections to be recorded are subject to mutual approval because, pursuant to the Recording Agreement, Tim McGraw expressly recognized the sale of records to be speculative. He recognized that it is Curb Records' ultimate judgment as to any matter affecting the sale, distribution and exploitation of records. In connection therewith, Curb Records has reserved the right, among other rights, to approve the musical selections McGraw records. Until recently, McGraw for years had recognized and honored Curb Records' rights to approve the content of records as required in the Recording Agreement. However, with respect to the fifth Option Album, despite reminder letters from Curb Records regarding Curb Records' approval rights in connection therewith, McGraw chose to ignore such rights.

22.    The schedule for Delivery of Option Period Albums in the Recording Agreement is designed to ensure that Tim McGraw's albums are received by Curb Records with all permissions and rights secured so that the record is market-ready. In addition, the Delivery schedule therein, while not trying to stifle artist creativity, also ensures that the albums are not "dumped" on Curb Records, but may be received, released and marketed to the public on a schedule designed to maximize the sale of each recording and to allow Curb Records to plan for

9

and release both McGraw's records and the records of others to allow it to function according to a prudent business plan.

23. The requirement in the Recording Agreement that the Option Period Albums be recorded within twelve (12) to eighteen (18) months following Delivery of the immediately prior Option Period Album is a material term of the Recording Agreement. Most importantly, it assures that Tim McGraw is recording new material in the proper time period so that each new Option Period Album embodies Tim McGraw's most current and topical performances. Particularly for an artist such as Tim McGraw, this factor becomes vitally important. His image and his music have changed since the inception of the Recording Agreement. From early recordings such as "Indian Outlaw" to later recordings such as "Live Like You Were Dying", to his 2010 hit recording "Felt Good On My Lips", Tim McGraw's vocal style has matured and evolved. He has grown from a club performer to one who now fills arenas and concert halls, commands large fees and audiences, and is an accomplished TV performer and movie star. Moreover, competition among artists and record companies for songs to record is fierce. The periods set forth in the Recording Agreement are designed, in addition, to allow McGraw and Curb Records time to find such songs to record and to obtain Curb Records' required approvals thereof. Tim McGraw has contended that he did not need to seek contractually required approvals from Curb Records with respect to the fifth Option Period Album under the Recording Agreement based upon his allegations that, unbeknownst to Curb Records, he did not always seek such contractually required approvals from Curb Records for past recording commitment albums. This is a non sequitur argument; future contractual breaches by one party are not excused by similar prior breaches by the same party. In fact, Tim McGraw knew that Curb Records had certain approval rights under the Recording Agreement and he had obtained Curb

Records' approval consistently in the past, as recently as in connection with the fourth Option Period Album. Yet while he recorded the fourth Option Period Album in a straightforward manner, he wrongfully tried to simultaneously record the fifth Option Period Album in a surreptitious manner, ignoring such contractually required approvals and the contractually required time frames in the Recording Agreement, in an attempt to try to prematurely get out of his Recording Commitment, while his agent was representing to Curb Records that McGraw would comply with all such duties in connection with the fifth Option Period Album.

24.     Finally, McGraw agreed that during the term of the Recording Agreement he would not record or permit others to record his performances for use on records by any person and/or entity other than Curb Records.

25.     This basic arrangement has worked well since 1997 and allowed McGraw and Curb Records to sell millions of records and for McGraw to earn millions of dollars in payments and royalties from Curb Records. Four (4) Option Period Albums have been released under the Recording Agreement.

26.     The fourth Option Period Album was released by Curb Records on or about October 20, 2009. Tim McGraw asserts that the fourth Option Period Album was Delivered at that time.[4]

27.     Tim McGraw acknowledges that he was obligated to record Masters for inclusion on the fifth Option Period Album between twelve (12) and eighteen (18) months after Delivery of the fourth Option Period Album, or, according to his calculations, between October 20, 2010 and April 20, 2011. McGraw's agents so admitted. McGraw's representative expressly assured

---

[4] Different representatives of McGraw have asserted two different Delivery dates for the fourth Option Period Album, August 10, 2009 and October 20, 2009. In either case, McGraw is in breach of the Recording Agreement for the reasons set forth herein.

Curb Records on March 24, 2010 that he would do so, stating that "To remove all doubt as he has done for all previous projects, it is Tim McGraw's intention to timely record and deliver the fifth (and final) option period album to Curb in complete compliance with the terms of the Agreement." (Emphasis supplied).

28.     Unknown at the time to Curb Records, however, McGraw had already recorded what he would soon claim constituted the fifth Option Period Album. Pursuant to the Recording Agreement, moreover, Delivery of the fifth Option Period Album was not permitted until between eighteen (18) and twenty-four (24) months from Delivery of the fourth Option Period Album, as Curb Records had exercised its right to extend that date by six (6) months. Even according to McGraw, therefore, pursuant to the Recording Agreement, Delivery of the fifth Option Period Album to Curb Records was not permitted until between April 20, 2011 and October 20, 2011, if October 20, 2009 was when the fourth Option Period Album was Delivered; or between February 10, 2011 and August 10, 2011, if the fourth Option Period Album was Delivered on August 10, 2009. Curb Records contends that the actual Delivery date of the fourth Option Period Album was even later and that, therefore, the fifth Option Period Album was to be recorded and Delivered even later.

29.     On October 22, 2010, long before Delivery of the fifth Option Period Album was permitted even by McGraw's calculations, McGraw provided to Curb Records twelve (12) Masters which he claimed to be the fifth Option Period Album and which he referred to as the "Emotional Traffic LP" (hereinafter "Emotional Traffic"). Moreover, approximately four months earlier, on June 23, 2010, these same Emotional Traffic recordings, labeled by Tim McGraw's representative as "rough mixes", had been provided to Curb Records. Furthermore, Tim McGraw started to record *Emotional Traffic* in 2008 or before. Therefore, obviously, all of

12

the *Emotional Traffic* recordings were recorded prior to the allowable period for recording Masters for inclusion on the fifth Option Period Album (–even according to McGraw's own calculations), and were, in fact, recorded during the fourth Option Period and before the fourth Option Period Album, "Southern Voice", was even released. Unlike any other instance during the term of the Recording Agreement, in effect, Tim McGraw recorded two albums (the fourth Option Period Album and Emotional Traffic) at once. By definition, Emotional Traffic did not meet the criteria of -- and cannot constitute -- the fifth Option Period Album. However, *Emotional Traffic* does constitute additional excess Masters under the Recording Agreement.

30. Further, the musical selections embodied in Emotional Traffic had not been submitted for Curb Records' approval, despite its specific numerous prior written requests, *inter alia*, on March 24, 2010 and July 2, 2010, and demands that Tim McGraw comply with the Recording Agreement and submit the selections to be included on the fifth Option Period Album for its approval.

31. Both after the receipt on June 23, 2010 of the "rough mixes" and after receipt of *Emotional Traffic*, Curb Records notified Tim McGraw  (and his agents have previously admitted receipt of such notifications) that *Emotional Traffic* could not and did not constitute the fifth Option Period Album. Curb Records reiterated that notice on January 13, 2011.

32. Nevertheless, ignoring the clear breach of the Recording Agreement's requirement of when the Masters embodied on the fifth Option Period Album could be recorded, Tim McGraw refused to Deliver the fifth Option Period Album to Curb Records, instead insisting that Emotional Traffic constituted such Album. This was a transparent tactic to attempt to fulfill his contractual recording commitments to Curb Records prematurely, in breach of the Recording Agreement.

33.    Tim McGraw is now in breach of the Recording Agreement. In a March 23, 2011 letter, Tim McGraw's representative confirmed in writing Tim McGraw's continuing refusal to record and Deliver the fifth Option Period Album.

34.    On or about April 20, 2011, Tim McGraw stated publicly that "the 'Emotional Traffic' album would be his 'absolute last album' with Curb if it kills him….", and that "All the songs have been done for a long time, and the label has had it."

35.    On or about April 26, 2011, Tim McGraw's representative once again advised Curb Records that Tim McGraw was refusing to record new Masters and affirmed Tim McGraw's position that Emotional Traffic were the final recordings that he would provide to Curb Records.

36.    Moreover, on June 21, 2001, Curb Records was only willing to agree to reduce its options under the Recording Agreement from six (6) to five (5) in order to induce Tim McGraw to perform under the Recording Agreement and to record and Deliver to Curb Records his five (5) Option Period Albums as he had agreed in the Recording Agreement. The Recording Agreement mandates that Tim McGraw was obligated to provide Curb Records with two (2) new Greatest Hits Masters for inclusion on a Greatest Hits album ("the First Hits LP"), which was to be the initial "Greatest Hits" album released after the execution of the Recording Agreement. The Recording Agreement also provided that if the First Hits LP's sales exceeded 1,500,000 units according to a "Formula" (as defined in the Recording Agreement), Curb Records' six (6) option periods would be reduced to five (5). Tim McGraw failed to Deliver those two (2) Greatest Hits Masters. Nevertheless, Curb Records elected to release an initial Greatest Hits album without the two (2) Greatest Hits Masters. The Greatest Hits album exceeded sales of 1,500,000 units. Although he had failed to Deliver the two (2) Greatest Hits Masters as he had

14

agreed in the Recording Agreement (and thus the conditions necessary to reduce the options from six (6) to five (5) were not met), Tim McGraw, nevertheless, demanded that Curb Records reduce the option period albums from six (6) to five (5). Although Curb Records continued its insistence upon the correctness of its contractual position, Curb Records was willing to acquiesce to McGraw's demands to reduce the number of its options only upon his reaffirmation of Curb Records' right to require five (5) Option Period Albums. Accordingly, Curb Records' representative confirmed on June 21, 2001 that Curb Records would consider the Greatest Hits album to be the First Hits LP ("the June 21, 2001 Settlement"). As a result of the June 21, 2001 Settlement, Curb Records also provided to Tim McGraw a \$250,000 advance payable in connection with the First Hits LP.

37.     Because he has refused to record and Deliver the fifth Option Period Album to Curb Records, Tim McGraw has also repudiated the June 21, 2001 Settlement. Curb Records is entitled, therefore, not only to a fifth Option Period Album, but also to a sixth Option Period Album under the Recording Agreement, as well as other remedies.

38.     The Undelivered Masters are unique and irreplaceable assets of Curb Records.

39.     In addition, Big Machine Records has induced or procured the breach of the Recording Agreement by McGraw because it has exploited Curb Records' exclusive property --- the Undelivered Masters. Not only has Curb Records been deprived of the exclusive right to exploit the Undelivered Masters, but it is also damaged because of their release. Curb Records has been deprived of the exclusivity of its right to exploit recordings made by Tim McGraw during the term of the Recording Agreement.

40.     Big Machine Records knew of the existence of the Recording Agreement, and the exclusivity provisions therein, as well as Curb Records' ownership of Masters and other

15

recordings by McGraw recorded during the term of the Recording Agreement, and fully aware of the harm it would inflict upon Curb Records, intended to induce its breach, acted with malice and proximately caused breaches of the Recording Agreement which have caused damage to Curb Records.

41. If McGraw is allowed to violate the essential and agreed-upon parameters during which he agreed to record the fifth (and sixth) Option Period Album(s) and otherwise violate the Recording Agreement, Curb Records will be further harmed. Curb Records has suffered damages which can, in part, be remedied through damages, but has and will also incur losses and damages which are irreparable, as well as consequential damages. Moreover, Curb Records, the recording industry and other industries which rely on personal services contracts -- and certainly those which rely upon contracts which include exclusivity provisions -- will suffer broader harm if McGraw and others can ignore the provisions of such agreements, selecting which provisions they may choose to follow and refusing to acknowledge others. If permitted, this would create chaos and vitiate the reliance on the contracts upon which relationships with recording artists and others who render personal services is based.

## COUNT I
### (Copyright Infringement Against All Defendants)

42. The allegations contained in paragraphs 1 through 41 of the Complaint are incorporated herein by reference.

43. The Undelivered Masters are the exclusive property of Curb Records. McGraw and/or McGraw Music, however, purport to own them, including the copyrights therein.

44. Because they were recorded during the term of the Recording Agreement, Curb Records is the exclusive and perpetual owner of the copyrights in the Undelivered Masters. As

16

such, pursuant to 17 U.S.C. §§ 106 and 114, it has the exclusive right to reproduce, distribute and otherwise exploit them.

45. Further, McGraw and/or McGraw Music have purported to license to or otherwise authorize Big Machine Records the rights to exploit, including to reproduce and distribute, the Undelivered Masters. Big Machine Records has duplicated and distributed the Undelivered Masters.

46. Accordingly, McGraw, McGraw Music and Big Machine Records have infringed Curb Records' copyrights in the Undelivered Masters.

47. In addition, Curb Records seeks this Court's declaration of its ownership in and to the Undelivered Masters, as well as the exclusive rights to exploit them, and the copyrights therein. Curb Records has been and will continue to be harmed irreparably if McGraw is able to ignore those provisions and contract with others to exploit sound recordings, and the copyrights therein, owned by Curb Records.

48. Curb Records has been damaged by the infringements of its copyrights. It seeks an accounting for and disgorgement of the Defendants' profits as a result of these infringements and Curb Records' actual damages. Those actual damages include, but are not limited to, Curb Records' lost profits incurred because the Defendants knowingly and intentionally caused certain of the Undelivered Masters to be released by Big Machine Records, contrary to representations by its President otherwise, fully realizing that those sales would lessen sales of McGraw records which had already been released legitimately by Plaintiff. These actions were taken by the Defendants with full knowledge that such releases were likely to, and with the intent to, inflict financial harm to Plaintiff. In addition, the value of the works which are, contractually, subject

17

to Plaintiff's exclusive rights, has been diminished because of the Defendants' unauthorized use thereof.

49. It is impossible to measure the harm incurred by Curb Records as a result of records which have not been sold and, therefore, any measure of sales by Big Machine Records and payment of profits therefrom to Curb Records would not compensate Curb Records fully. Moreover, Curb Records' reputation would be irreparably harmed were Tim McGraw and Big Machine Records allowed to vitiate the essence of the Recording Agreement. Finally, Tim McGraw is a unique and irreplaceable and extraordinary talent and the loss of his unique and extraordinary sound recordings would render a harm to Curb Records which is incapable of being fully remedied by the payment of damages. For all of these reasons, Curb Records is entitled to permanent injunctive relief to prevent the Defendants from exploiting the recordings and infringing the copyrights which Curb Records owns.

50. In addition, Tim McGraw is a contributory copyright infringer. He knew that Curb Records was and is the exclusive owner of the Undelivered Masters, the right to exploit them and the copyrights therein. He knew that he recorded them, and intentionally did so during the term of the Recording Agreement. He knew he had done so when he and/or McGraw Music contracted with Big Machine Records and authorized its exploitation of the Undelivered Masters, enabling Big Machine Records' infringements.

51. Curb Records seeks this Court's declaration that it is the owner, perpetually and exclusively, of the Undelivered Masters, as well as all other recordings made by McGraw during the term of the Recording Agreement but not yet Delivered to Curb Records, including the copyrights therein and, in addition, that the Defendants have infringed those copyrights, entitling

Curb Records to the benefit of all of the rights and remedies afforded to it under the Copyright Act of the United States, 17 U.S.C § 101, *et seq.*

**COUNT II**
**(Declaration of Invalidity of McGraw Music's Claim of**
**Copyright Ownership in the Undelivered Masters)**

52. Plaintiff realleges and incorporates paragraphs 1 through 51 of the Complaint herein by reference.

53. Because McGraw Music has no basis to claim ownership of the copyrights in the Undelivered Masters and such claim is infringing upon Plaintiff's own rights therein, Plaintiff seeks the declaration of this Court that such claims of McGraw Music are invalid and of no effect.

54. Such a claim of copyright ownership in the Undelivered Masters by McGraw Music is false, inaccurate and material. If not invalidated, this erroneous claim and ultimate registration will cause the public record to fail of its essential purpose, to provide a reliable and accurate source of information as to copyright ownership.

**COUNT III**
**(Breach of Contract against McGraw)**

55. Curb Records re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 54 of the Complaint.

**Option Period Albums**

56. Curb Records seeks this Court's declaratory judgment that Tim McGraw is in breach of the Recording Agreement because, among other things, he has failed to record and Deliver to Curb Records the fifth Option Period Album pursuant to the terms of the Recording Agreement and that Curb Records may, accordingly, exercise all of the rights provided to it in

the Recording Agreement upon Tim McGraw's failure and/or refusal to Deliver Masters to Curb Records; and that Curb Records is also entitled to a sixth Option Period Album.

57.    The parties recognized in the Recording Agreement that Tim McGraw's services thereunder are of a "special, unique and extraordinary character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action of law." As the parties recognized, the personal services which Tim McGraw agreed to render to Curb Records are special, unique and invaluable. Accordingly, as he has failed and refused to perform his obligations thereunder, including, but not limited to, recording and Delivering the fifth Option Period Album to Curb Records, Curb Records seeks permanent injunctive relief preventing him from agreeing to provide, or providing, his personal services as a recording artist for the benefit of parties other than Curb Records until he has fulfilled his duties and obligations under the Recording Agreement or for such period and upon terms and conditions as the Court determines and equity dictates.

58.    Curb Records is also entitled to those compensatory and consequential damages which it has incurred and may incur because of Tim McGraw's breaches of the Recording Agreement and his failure to Deliver the fifth Option Period Album to Curb Records, and otherwise.

## Masters and other recordings

59.    The Recording Agreement provides that Curb Records is the exclusive and perpetual owner of all Masters and all other recordings embodying McGraw's performances made during the term of the Recording Agreement. Specifically, Section 4 of the Recording Agreement states as follows: "You [Tim McGraw] hereby grant and convey to Curb and confirm

that Curb shall be the exclusive perpetual owner of all Masters (and all other recordings [if any] embodying your performances made during the term hereof) throughout the universe...."

60.     In breach of this contractual provision, McGraw has also failed to provide to Curb Records all Masters (and all other recordings) embodying his performances recorded during the term of the Recording Agreement. Curb Records is aware of numerous such Masters (and/or other recordings), in addition to the Undelivered Masters, that McGraw created during the term of the Recording Agreement but failed to convey to Curb Records.

61.     Upon information and belief, McGraw has recorded additional Masters (and/or other recordings) during the term of the Recording Agreement that embody his performances. Upon information and belief, McGraw is currently in possession or control of such Masters (and/or other recordings) but has failed or refused to provide them to Curb Records.

62.     In fact, McGraw has taken steps to prevent Curb Records from learning of the existence of these Masters (and/or other recordings) by destroying them and/or removing his voice from them; and by failing to report their having been recorded at the time to the appropriate union and/or to Curb Records.

63.     Curb Records has been damaged by McGraw's breach of the Recording Agreement by his destroying Masters and/or failing to provide to Curb Records all Masters (and all other recordings) embodying his performances that were recorded during the term of the Recording Agreement. Curb Records seeks to recover all such Masters (and all such other recordings), including any and all tangible embodiments of McGraw's recorded performances, as well as damages, from the withholding, destruction, and/or wrongful exploitation of its exclusive property and injunctive relief to prevent any unauthorized exploitation of them.

## The Undelivered Masters

64.    The Undelivered Masters were recorded during the term of McGraw's Recording Agreement with Curb Records, as the term of that agreement has yet to expire. Accordingly, the Undelivered Masters and the rights to exploit them belong exclusively and perpetually to Curb Records.  McGraw has breached the Recording Agreement by failing to provide, grant and convey the Undelivered Masters to Curb Records and by providing them to Big Machine Records.

65.    Curb Records has been damaged by McGraw's breach and seeks to recover those damages, including damages from the withholding and wrongful exploitation and destruction of its exclusive property.   Curb Records also seeks to recover possession of the Undelivered Masters and injunctive relief to prevent their unauthorized exploitation and destruction.

## Exclusivity

66.    Under the Recording Agreement, McGraw agreed to provide his exclusive services as a recording artist to Curb Records during the term of the Recording Agreement.

67.    The exclusivity of the Recording Agreement continues until nine (9) months after McGraw's Delivery to Curb Records of the Masters required during the final Option Period Album.

68.    The purpose of this nine (9) month post-Delivery period of exclusivity is to provide Curb Records with the opportunity to maximize its sales of McGraw records until the term of the Recording Agreement is over.  It is particularly important that, during this post-Delivery period of exclusivity, McGraw not impede Curb Records' efforts to maximize sales by providing his services as a recording artist directly to the public and/or to some person or entity other than Curb Records.  Any such competing efforts by McGraw would invariably cause

confusion in the marketplace and hinder Curb Records' ability to maximize its sales of McGraw records.

69.     Nevertheless, in breach of the exclusivity provision of the Recording Agreement, McGraw has provided and promoted his services as a Big Machine Records recording artist during the term of his Recording Agreement with Curb Records. McGraw has entered into a recording agreement with Big Machine Records, recorded Masters (and/or other recordings) for Big Machine Records, and released records to radio and otherwise through Big Machine Records in competition with Curb Records.

70.     Curb Records has been damaged by McGraw's breaches of the exclusivity provisions of the Recording Agreement and seeks to recover damages for these breaches.

## COUNT IV
## (Conversion against McGraw and McGraw Music)

71.     Curb Records re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 70 of the Complaint.

### Masters and other recordings

72.     Under the Recording Agreement, all Masters (and all other recordings) embodying McGraw's performances that were recorded during the term of the Recording Agreement belong exclusively and perpetually to Curb Records.

73.     Nevertheless, McGraw and McGraw Music have appropriated certain such Masters (and/or other recordings) to his and/or their own use and benefit by the exercise of dominion over them in defiance of Curb Records' rights by, among other things, destroying certain such Masters (and/or other recordings), concealing their existence from Curb Records, and refusing to provide them to Curb Records upon request.

74.     Curb Records has suffered damages as the result of McGraw's and McGraw Music's conversion of Curb Records' property and seeks an award of compensatory damages against them.  Curb Records also submits that McGraw's and McGraw Music's conversion was intentional, fraudulent, malicious, or reckless and, thus, an award of punitive damages is appropriate.  Finally, Curb Records also seeks to recover possession of all Masters (and all other recordings) embodying McGraw's performances that were created during the term of the Recording Agreement but are not yet in Curb Records' possession, and injunctive relief to prevent their unauthorized exploitation and destruction.

## The Undelivered Masters

75.     Under the Recording Agreement, all Masters (and all other recordings) embodying McGraw's performances that were recorded during the term of the Recording Agreement belong exclusively and perpetually to Curb Records.

76.     As discussed herein, the Undelivered Masters were recorded during the term of the Recording Agreement and, as such, exclusive and perpetual ownership of the Undelivered Masters belongs to Curb Records under the Recording Agreement.

77.     Nevertheless, McGraw and McGraw Music have appropriated the Undelivered Masters to his and/or their own use and benefit by the exercise of dominion over them in defiance of Curb Records' rights.  For instance, McGraw and McGraw Music have failed and refused to provide the Undelivered Masters to Curb Records and has provided them to Big Machine Records in defiance of Curb Records' exclusive rights.

78.     Curb Records has suffered damages as the result of McGraw's and McGraw Music's conversion of Curb Records' property and seeks an award of compensatory damages for this wrongful conversion.  Curb Records also submits that this conversion was intentional,

fraudulent, malicious, or reckless and, thus, an award of punitive damages is appropriate. Finally, Curb Records also seeks to recover possession of the Undelivered Masters and injunctive relief to prevent their unauthorized exploitation and destruction.

**COUNT V**
**(Conversion against Big Machine Records)**

79.     Curb Records re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 78 of the Complaint.

80.     Under the Recording Agreement, all Masters (and all other recordings) embodying McGraw's performances that were recorded during the term of the Recording Agreement belong exclusively and perpetually to Curb Records.

81.     As set forth herein, the Undelivered Masters were recorded during the term of McGraw's Recording Agreement with Curb Records and, as such, exclusive and perpetual ownership of the Undelivered Masters belongs to Curb Records.

82.     Nevertheless, Big Machine Records has appropriated the Undelivered Masters to its own use and benefit by the exercise of dominion and exploitation over them in defiance of Curb Records' rights.

83.     Curb Records has suffered damages as the result of Big Machine Records' conversion of Curb Records' property and seeks an award of compensatory damages for this wrongful conversion. Curb Records also submits that Big Machine Records' conversion was intentional, fraudulent, malicious, or reckless and, thus, an award of punitive damages is appropriate. Finally, Curb Records also seeks to recover possession of the Undelivered Masters and injunctive relief to prevent their unauthorized exploitation.

## COUNT VI
## (Procurement of Breach of Contract)

84.    Curb Records re-alleges and incorporates herein by reference the allegations contained in paragraphs 1 through 83 of the Complaint.

85.    McGraw's exclusive Recording Agreement with Curb Records remains in effect until nine (9) months after McGraw Delivers to Curb Records all Masters required during the final Option Period.  McGraw has yet to Deliver such Masters to Curb Records and, as such, remains under contract to Curb Records.

86.    In defiance of Curb Records' contractual rights – and in violation of common law and Tenn. Code Ann. § 47-50-109 – Big Machine Records has induced or procured McGraw's breach or violation of the Recording Agreement and has also induced or procured McGraw's refusal or failure to perform under the Recording Agreement.

87.    Among other things, Big Machine Records has induced or procured McGraw's breach or violation of the exclusivity provisions of his Recording Agreement with Curb Records by entering into a separate recording agreement with McGraw.  Big Machine Records has also induced McGraw to provide his services as a recording artist to Big Machine Records during the term of McGraw's Recording Agreement with Curb Records.  In addition, Big Machine Records has procured McGraw's breach of the Recording Agreement by inducing McGraw to provide or agree to provide the Undelivered Masters, directly or indirectly, to Big Machine Records during the term of McGraw's Recording Agreement with Curb Records.

88.    Big Machine Records is liable for treble the amount of damages resulting from or incident to the breaches of contract that it procured or induced, and/or punitive damages.

WHEREFORE, Curb Records demands judgment:

1. Against the Defendants for copyright infringement in violation of 17 U.S.C. §§ 101, et seq. and for damages pursuant thereto; and

2. For all remedies available to it pursuant to 17 U.S.C. §§ 101, et seq. as a result of such infringements, including, but not limited to, Curb Records' actual damages, lost profits, diminution in the value of its exclusive property, and/or the disgorgement of the Defendants' profits; and

3. For a declaration that under the Recording Agreement Curb Records owns the copyrights in the Undelivered Masters, as well as all other recordings made by Tim McGraw during the term of the Recording Agreement but not yet Delivered to Curb Records; and

4. For a declaration that the Defendants' claim to the copyright ownership in the Undelivered Masters, and any registration thereof, are invalid; and

5. That the Court declare that Tim McGraw is in breach of the Recording Agreement because, among other things, he has failed and refused to record and Deliver to Curb Records the fifth Option Period Album pursuant to the terms of the Recording Agreement; and

6. That the Court declare that Emotional Traffic does not and cannot constitute the fifth Option Period Album; and

7. That Curb Records may exercise all of the rights provided to it in the Recording Agreement upon Tim McGraw's failure or refusal to Deliver Masters; and

8. That the Court declare that as he has repudiated the June 21, 2001 Settlement, Tim McGraw is obligated to record and Deliver a sixth Option Period Album to Curb Records under the Recording Agreement; and

9. For compensatory damages from Tim McGraw and McGraw Music; and

10. For compensatory damages from Big Machine Records; and

11. For punitive damages from Tim McGraw and McGraw Music; and

12. For punitive damages from Big Machine Records; and

13. With respect to the violations of T.C.A. § 47-50-109 and/or at common law by Big Machine Records, treble damages or punitive damages from Big Machine Records, at Curb Records' option; and

14. For possession by Curb Records of all recordings made by Tim McGraw embodying his performances made during the term of the Recording Agreement (including, without limitation, all the Undelivered Masters); and

27

15. For permanent injunctive relief, including an injunction preventing Tim McGraw from recording for himself and/or others (i)_ until he has fulfilled his obligations under the Recording Agreement, or (ii) upon such other terms as are just; and

16. For attorneys' fees; and

17. For such other and further relief to which it may be entitled.

Jay S. Bowen, BPR No. 2649
Will Parsons, BPR No. 26519
BOWEN & UNGER, PLC
47 Music Square East
Nashville, TN 37203
Tel: (615) 329-4440
Fax: (615) 329-4485
jbowen@bowenungerlaw.com
wparsons@bowenungerlaw.com

*Attorneys for Plaintiff Curb Records, Inc.*